# ORIGINAL

## In the United States Court of Federal Claims

No. 17-471C

**FILED**

(Filed:  October 24, 2017)

OCT 24 2017

U.S. COURT OF
FEDERAL CLAIMS

```
*********************************
                                  )
BRIAN X. SCOTT,                   )
                                  )
              Plaintiff,          )
                                  )
      v.                          )
                                  )
UNITED STATES,                    )
                                  )
              Defendant.          )
                                  )
*********************************
```

Contract claim based upon submission of an
unsolicited proposal to the Air Force;
applicability of 48 C.F.R. ("FAR") §§ 3.601,
3.602, 15.603, 15.606-1, 15.608;
jurisdiction; indefinite and speculative
allegations

Brian X. Scott, *pro se*, Colorado Springs, Colorado.

Mariana Teresa Acevedo, Trial Attorney, Commercial Litigation Branch, Civil Division,
United States Department of Justice, Washington, D.C., for defendant.  With her on the briefs
were Chad A. Readler, Principal Deputy Assistant Attorney General, Civil Division, Robert E.
Kirshman, Jr., Director, and Deborah A. Bynum, Assistant Director, Commercial Litigation
Branch, Civil Division, United States Department of Justice, Washington, D.C., and Chun-I
Chang, Air Force Legal Operations Agency, Joint Base Andrews, Maryland.

## OPINION AND ORDER

LETTOW, Judge.

Plaintiff, Brian Scott, seeks both monetary and injunctive relief in a suit against the
United States for alleged harms arising from its handling of plaintiff's unsolicited proposal for
contractual work.  Mr. Scott submitted the proposal at issue on January 11, 2017, while stationed
at Incirlik Air Base, Turkey, as an employee of the Air Force.  Compl. at 6.  The proposal was
submitted on a confidential, proprietarily-restricted basis and addressed means of countering a
perceived threat of a drone strike on Incirlik.  Compl. at 6.  The proposal was rejected while Mr.
Scott was on leave away from the base, Compl. at 7, but upon return, Mr. Scott alleges that
portions of his proposal were being partially implemented, Compl. at 9.  Mr. Scott filed suit in
this court on March 30, 2017, claiming that the Air Force had failed properly to review his
proposal and that his intellectual property was being misappropriated.  *See* Compl. at 8-9.

Pending before the court is the government's motion to dismiss for lack of subject matter
jurisdiction and failure to state a claim pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of

7017 1450 0000 1346 1840

the Court of Federal Claims ("RCFC"). Mr. Scott has responded in opposition and has also sought leave to clarify and add to his claims.

## BACKGROUND

At least since December 2015, Mr. Scott has been employed by the Air Force at the Incirlik Air Base in Turkey. Compl. at 6. While at Incirlik, Mr. Scott "started to study" the base and concluded that the base was vulnerable to a drone strike that could "cause widespread destruction and effectively shut the base operations down." Compl. at 6. Concerned, Mr. Scott "spent the next two weeks researching how to defend against that threat[] and another [two] weeks designing an organization to conduct that defense." Compl. at 6. He then "wrote that solution up in the form of an [u]nsolicited [p]roposal" and submitted it to the "Contracting Squadron at Incirlik" on January 22, 2016. Compl. at 6. The proposal was rejected. Compl. at 6. Later, after an unspecified attack against military assets in another country using the drone "technology [he] had anticipated," Mr. Scott "quickly updated the old proposal" and submitted the updated version to the Air Force's "top . . . contracting official in Europe" on January 11, 2017. Compl. at 6.

Mr. Scott took leave in mid-February 2017 and returned in early March. Compl. at 7. While on leave, he was notified that his proposal had been rejected on two grounds: (1) the proposal failed to meet the requisite definition of an unsolicited proposal under the Federal Acquisition Regulations ("FAR"), 48 C.F.C. § 15.603(c)(5), because it "address[ed] a previously published agency requirement" and was therefore not entitled to further review under FAR § 15.606-1(a)(1), and (2) as a government employee, FAR § 3.601(a) prohibits the government from awarding Mr. Scott a government contract absent, per FAR § 3.602, a "compelling reason . . . such as when the [g]overnment's needs cannot reasonably be otherwise met." Compl. Ex. 4, at 1-2. No such exception was made in Mr. Scott's case. Compl. Ex. 4, at 1; *see also* Def.'s Mot. to Dismiss ("Def's Mot.") at 9, ECF No. 16. Upon returning to Incirlik on March 6, 2017, Mr. Scott avers that he "saw signs that the Air Force or somebody else was implementing two of the major prongs of [his] proprietary [a]pproach." Compl. at 9. On March 8, 2017, Mr. Scott sent the Air Force a cease and desist e-mail, indicating that it could be a "coincidence that the Air Force thought of taking these prudent steps just weeks after [he] submitted [his] [p]roposal," but he found it "very suspicious." Compl. Ex. 9, at 1-3. Thereafter, on March 30, 2017, Mr. Scott filed the current suit, claiming that the Air Force failed to properly evaluate his proposal "according to the guidance in the FAR," Compl. at 8, and that "the Air Force has taken and started using [his] proprietary intellectual property . . . without [his] consent" in violation of FAR § 15.608(a). Compl. at 9.[1]

Mr. Scott seeks injunctive relief, damages, and specific performance as remedies. Compl. at 11-13. For injunctive relief, he asks the court to order the Air Force "to immediately stop using [his] proprietary material." Compl. at 11. As to damages, Mr. Scott seeks $350,422,500.00 in compensatory damages, "the price that [he] proposed for implementing [his] [a]pproach;" $1,000,000.00 in punitive damages "as punishment for violating the FAR and for

---

[1]Mr. Scott stated that he has not "obtain[ed] either a patent or a copyright to protect [his] ownership of that [intellectual property]." Compl. Addendum 2, at 3.

stealing [his intellectual property];" and $1,000,000.00 in exemplary damages "to remind the agency about the importance of a [g]overnmental entity acting with integrity." Compl. at 11-12. Finally, Mr. Scott asks this court to order specific performance in the form of awarding a "[t]ransaction for [p]rototype [p]roject, . . . [r]esearch [g]rant, or a [c]ontract" in the amount of $350,442,500.00. Compl. at 12. In the alternative, he asks the court to require the "Air Force to process [his proposal in accordance with] FAR [Subpart] 15.6, including a comprehensive technical evaluation" and to "order the Department of Defense to[, *inter alia*,] create a directory of all [p]oints of [c]ontact who are designated to receive [u]nsolicited [p]roposals[,] to post that directory on the Internet[, and] . . . to update that directory annually." Compl. at 12-13.

In opposing the government's motion to dismiss, *see generally* Pl.'s Mem. in Opp'n to Mot. to Dismiss ("Pl.'s Opp'n"), ECF No. 17, Mr. Scott explicitly raises a Fifth Amendment takings claim for the first time. *Id.* at 8. Subsequently, he also has sought leave to clarify or amend his complaint, *see* Pl.'s Request to Add an Additional Specification to My Original Claim ("Pl.'s Mot. to Amend."), ECF No. 19.

## STANDARDS FOR DECISION

### A. Subject Matter Jurisdiction

In any action, the plaintiff has the burden of establishing jurisdiction. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988). When ruling on a motion to dismiss for lack of jurisdiction, the court must "accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). The leniency afforded to a *pro se* plaintiff with respect to formalities does not relieve such a litigant from satisfying jurisdictional requirements. *Kelley v. Secretary, U.S. Dep't of Labor*, 812 F.2d 1378, 1380 (Fed. Cir. 1987).

The Tucker Act provides this court with jurisdiction over "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The bar for establishing subject matter jurisdiction over such contract claims is not high. *See Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1353 (Fed. Cir. 2011) ("[J]urisdiction under [the Tucker Act] requires no more than a non-frivolous *allegation* of a contract with the government.") (emphasis in original) (citing *Lewis v. United States*, 70 F.3d 597, 602, 604 (Fed. Cir. 1995); *Gould, Inc. v. United States*, 67 F.3d 925, 929-30 (Fed. Cir. 1995)). "The general rule is that so long as the plaintiffs have made a non-frivolous claim that they are entitled to money from the United States . . . because they have a contract right, this court has jurisdiction to settle the dispute." *Anchor Tank Lines, LLC v. United States*, 127 Fed. Cl. 484, 493 (2016) (citing *Adarbe v. United States*, 58 Fed. Cl. 707, 714 (2003)) (additional citations and internal quotation marks omitted).

### B. Stating a Claim

To survive a motion submitted under RCFC 12(b)(6), the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007)). The factual matters alleged "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (internal citation omitted). Therefore, "the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff." *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009) (citing *Papasan v. Allain*, 478 U.S. 265, 283 (1986) (additional citation omitted)). "Where, as here, a party appear[s] *pro se* before the trial court, the . . . court may grant the *pro se* litigant leeway on procedural matters, such as pleading requirements. Indeed, the Supreme Court has recognized this less demanding standard." *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1356 (Fed. Cir. 2007) (citing *Hughes v. Rowe*, 449 U.S. 5, 14 (1980) ("An unrepresented litigant should not be punished for his failure to recognize subtle factual or legal deficiencies in his claims.")). "However, regardless of whether the plaintiff is proceeding *pro se* or is represented by counsel, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Id.* (citation and internal quotation marks omitted).

## ANALYSIS

### A. Jurisdiction

Mr. Scott alleges that an implied-in-fact contract has arisen between himself and the Air Force in at least two ways. First, in submitting his proposal to an Air Force contracting officer, FAR guaranteed him proper evaluation under Subpart 15.6. *See* Compl. at 7-9. Second, once his proposal was submitted and marked with a restrictive legend, FAR § 15.608 created an implied-in-fact contract that prohibited the Air Force from "us[ing] any data, concept, idea, or other part" of the proposal or "disclo[sing the] restrictively marked information . . . included [within the] proposal" without notifying or receiving consent from Mr. Scott. FAR § 15.608; *see also* Compl. at 9-10; Pl.'s Opp'n at 12-13. Mr. Scott disputes the government's claim that it followed the proper evaluative process, *see* Pl.'s Opp'n at 2-6, and he avers that the government has used, and thus necessarily inappropriately disclosed, the ideas and concepts from his unsolicited proposal. *See* Compl. at 9-10.

"The general requirements for a binding contract with the United States are identical for both express and implied contracts. The party alleging a contract must show a mutual intent to contract including an offer, an acceptance, and consideration." *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) (citations omitted). The government asserts that the court "cannot infer from the circumstances here . . . that the mere submission of [Mr. Scott's] proposal create[s] an implied-in-fact contract [because] [t]he agency never 'solicited' [his] alleged proprietary information[,] let alone agreed to maintain its confidentiality." Def.'s Mot. at 15. Nonetheless, the regulations spell out a process by which the government will receive and process *unsolicited* proposals, offering just such confidentiality protections. FAR § 15.602 explains that the reason for providing such a process is to "encourage the submission of new and innovative ideas . . . [that] do not fall under topic areas publicized" by the agencies. FAR Subpart 15.6 acts as an open offer, not for a contract to provide goods or services but as a pledge to consider and evaluate submitted proposals according to the procedures laid out in the regulations and to provide such protections as the regulations mandate. Particularly, FAR §

15.608 offers the safeguards that the government disclaims in its motion; it specifies that the government

> shall not use any data, concept, idea, or other part of an unsolicited proposal as the basis, or part of the basis, for a solicitation or in negotiations with any other firm unless the offeror is notified of and agrees to the intended use. However, this prohibition does not preclude using any data, concept, or idea in the proposal that is also available from another source without restriction.

FAR § 15.608(a).  And, Section 15.608 also provides that the government "shall not disclose restrictively marked information (see 3.104 and 15.609) included in an unsolicited proposal." FAR § 15.608(b).  If there were no mechanism for submitters of unsolicited proposals to enforce the government's promises in FAR § 15.608, the purpose of Subpart 15.6 would be undermined. One submitting a proposal would hardly have an incentive to send new and innovative ideas to the government without the assurance that the government could not then use or share the proposal without the submitters' consent.

In *Airborne Data, Inc. v. United States*, 702 F.2d 1350, 1361 (Fed. Cir. 1983), the Federal Circuit held that comparable regulations constituted an offer from the government that the prospective contractor accepted upon the submission of a conforming unsolicited proposal, forming an implied-in-fact contract.[2]  As in *Airborne Data*, "[t]he essence of [Mr. Scott's] case is that defendant extended to plaintiff a valid and authorized invitation to submit an unsolicited proposal . . . .  Defendant prescribed how, on submitting such a proposal, plaintiff might indicate that it did not want its ideas disclosed to the public . . . [and p]laintiff accepted defendant's invitation" by submitting the proposal in the manner prescribed.  *Id.*  And, although the government also argues that "FAR Subpart 15.6 is not money mandating," Def.'s Mot. at 12 (heading, capitals omitted), that contention is negated by the Federal Circuit's decision in *Airborne Data*, holding that an unsolicited proposal submitted in conformity with a provision comparable to Subpart 15.6 gives rise to an implied-in-fact contract, 702 F.2d at 1361.  The decisions in *Xerxe Group, Inc. v. United States*, 278 F.3d 1359, 1360 (Fed. Cir. 2002), *Grayton v. United States*, 92 Fed. Cl. 327, 335 (2010), and *Block v. United States*, 66 Fed. Cl. 68, 73-4 (2005), are not to the contrary because in each of those cases the plaintiff had failed to demarcate and identify the allegedly protected information in the manner provided in the regulations.

Additionally, contrary to the government's assertion, the mere fact that Mr. Scott is a government employee does not defeat any requisite "meeting of the minds" insofar as the terms of the regulations might apply to establish an implied-in-fact contract.  *Contra* Def.'s Mot. at 15. While FAR § 3.601 prohibits government employees from being awarded contracts, FAR § 3.602 allows for an exception.  Mr. Scott, like any submitter, had no way of knowing prior to submitting his proposal whether the Air Force would exercise its discretion and exempt him from the prohibition on government employee awards.  To read FAR § 3.601 as denying all submissions by government employees the protections offered in Section 15.608 before the

---

[2]At issue in *Airborne Data* was a regulation promulgated by the Department of the Interior, then as now codified at 41 C.F.R. § 14-4.5101-3(a)(1), that in all material respects was and is comparable to the regulations at issue in this case.

agency has made any decision regarding applicability of the exception stated in FAR § 3.602 would undermine the purpose of Subpart 15.6 and of having the exception. Therefore, the court declines to so read it.

It is not frivolous for Mr. Scott to assert that he accepted the government's offer contained in FAR Subpart 15.6 when he submitted his proposal in conformance with the regulations and that an implied-in-fact contract was formed when the Air Force became obligated to follow FAR's regulatory constraints. As the court's jurisdictional requirements under the Tucker Act require no more from Mr. Scott, *see City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998) (holding that "a non-frivolous assertion of an implied contract with the United States" is sufficient to establish subject matter jurisdiction in this court), the court has subject matter jurisdiction over his contract claim.

### B.  Contractual Claims

Turning to the merits of Mr. Scott's claims, to survive a motion submitted under RCFC 12(b)(6), the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). The inquiry into plausibility requires the court to address whether the factual allegations in the complaint are "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also Council for Tribal Employment Rights v. United States*, 112 Fed. Cl. 231, 241 (2013); *Grayton*, 92 Fed. Cl. at 331. Mr. Scott claims that he is entitled to relief because the government has breached its implied contact with him to properly evaluate his unsolicited proposal and then disclosed and used the information he provided without his consent or compensation, again, in breach of contract. *See* Compl. at 7-10, 13. The government denies failing to properly evaluate Mr. Scott's claim because his proposal was not entitled to further review under FAR Subpart 15.6 and because, as a government employee, his proposal could not be accepted under the circumstances. Def.'s Mot. at 8-9. The government further asserts that it has not used or disclosed the ideas, concepts, or information from Mr. Scott's proposal. *Id.* at 17-18.

#### 1.  FAR evaluation.

All unsolicited proposals must pass through a three-tier evaluative process before being accepted. *See* FAR §§ 15.606-15.607 (identifying initial review, comprehensive evaluation, and acceptance and negotiation of unsolicited proposals). Upon receipt, unsolicited proposals pass through an initial review to, *inter alia*, determine if the proposal is a "valid unsolicited proposal meeting the requirements of 15.603(c)." FAR § 15.606-1(a)(1). Proposals that meet the requirements of the initial review pass to the comprehensive evaluation under Section 15.606-2, while those that fail to meet such requirement are rejected. FAR § 15.606-1(b), (c).

The Air Force determined that Mr. Scott's proposal failed at the initial review stage because it "addressed a previously published agency requirement;" therefore, it "did not further evaluate [the] proposal." Compl. Ex.4, at 1-2; *see also* Def.'s Mot. at 3-4. The government specifically pointed to a solicitation, published in December 2015, for bids on "handheld counter-UAS devices," *i.e.*, a signal-disrupter, disrupting both a drone's remote control and GPS

signals, that are "meant to disrupt the drone signals for a line of sight threat." Compl. Ex. 4, at 2. The handheld devices were "only meant to be a small portion of the overall threat response" due to the "known weaknesses" in the relevant technologies. Compl. Ex. 4, at 2.

Mr. Scott's primary counterargument to the government's determination is that the handheld devices, what he calls "toy ray gun[s]," are ineffective and specific while his proposal is "comprehensive [and] layered." Pl.'s Opp'n. at 2-3. In his view, this distinction makes his proposal different and not covered by the published requirement. Mr. Scott compares the handheld device to a solicitation "for a skateboard to carry soldiers into battle" and his proposal to "something like an Abrams Tank." *Id.* at 4.

Mr. Scott's analogy is inapt. When publishing solicitations for defense contracts, the government is free to address its needs by proceeding in a piecemeal fashion; it need not solicit an overall approach or even every component of such an approach at once. Here the government sought to address the threat of a drone strike by seeking proposals addressing a particular aspect of that threat. Proposals that would likewise address that aspect of the threat must be submitted in conformity with the published solicitation. Where a would-be contractor proposes to address other aspects of a particular threat, those for which no solicitation has been published, he or she is free to submit an unsolicited proposal. But FAR § 15.603(c)(6) prohibits the circumvention of the competitive bidding process by submitting an unsolicited proposal addressing a requirement of a previously published solicitation. Mr. Scott has conceded that a prior solicitation contained a published requirement that his unsolicited proposal addressed. *See* Compl. at 8-9 ("In my [p]roposal, I actually refer to such [handheld devices], indicating that they might be used as appropriate."). There may be reasons for the government to prefer one means of addressing a requirement over another, but such policy considerations are irrelevant to the court's analysis of whether a proposal addresses a previously published requirement.

Importantly, while Mr. Scott's proposal addresses other means of forestalling drone attacks, those means are described in conceptual terms, not as specific items. See, *e.g.*, Compl. Ex. 2, at 30 (Technical [I]nformation) ("1. I will develop . . . . 2. I will develop . . . . 3. . . . . I will collaborate . . . . 4. I will completely prevent . . . . 5. I will develop . . . .") The facts as alleged do not indicate that his proposal was entitled to any review beyond the initial review required in FAR § 15.606-1.

The government also argues that Mr. Scott has failed to state a claim for breach of the implied contract to properly evaluate his proposal because he is a government employee and is thus ineligible for the award of a government contract. Def.'s Mot. at 6-7. FAR § 3.601 states that "[e]xcept as specified in 3.602, a contracting officer shall not knowingly award a contract to a [g]overnment employee . . . ." Section 3.602 in turn states that the "agency head, or a designee . . . , may authorize an exception to 3.601 only if there is a most compelling reason to do so, such as when the [g]overnment needs cannot reasonably be otherwise met." The government seems to assert that Mr. Scott's failure to solicit or to receive such an exception forecloses him from meeting the requirements of such an exception. *See* Def.'s Mot. at 9. But that argument reaches too far.

The government's decision to deny Mr. Scott an exception under FAR § 3.602 is subject to the scrutiny of this court; there must be a "'rational connection between the facts found and the choice made,'" but the court may not "'substitute its judgment for that of the agency.'" *CBY Design Builders v. United States*, 105 Fed. Cl. 303, 338 (2012) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Mr. Scott claims his proposal merits an exception because saving lives is a "most compelling reason to award a contract to a government employee" and that "the [g]overnment's needs cannot reasonably be otherwise met" because he owns the intellectual property contained in his proposal. Pl.'s Opp'n. at 7. The government, in its letter rejecting Mr. Scott's proposal, asserts that it has determined that there is no "most compelling reason" to grant an exception in Mr. Scott's case because its "needs can be met by competitive methods." Compl. Ex. 4, at 2. In support of this determination, the letter itself contains the publication notice of the December 2015 solicitation that addressed the threat of drone strikes. The fact that Mr. Scott's unsolicited proposal could be rejected because it addressed a previously published requirement supports the government's assertion that it can meet its needs through competitive means. Mr. Scott has not addressed this possibility, apart from claiming that he owns the intellectual property contained in his proposal. In that respect, Mr. Scott stated that he has not "obtain[ed] either a patent or a copyright to protect [his] ownership of that [intellectual property]." Compl. Addendum 2, at 3. Even if he had established exclusive proprietary rights in his ideas, Mr. Scott's claim only undermines the government's reasoning if one assumes that Mr. Scott's approach is the *only* approach that would meet the government's need. He has alleged no facts that support such an assumption.[3]

In short, Mr. Scott has failed to state a breach of contract claim as to the Air Force's evaluation of his proposal because his factual allegations, even taken in the light most favorable to him, do not plausibly establish that the government acted unreasonably or failed to properly evaluate his unsolicited proposal. Therefore, those claims shall be dismissed.

*2. Disclosure or use of information from the proposal.*

Mr. Scott also alleges that the government breached the implied-in-fact contract arising out of FAR § 15.608 insofar as the government has used the information in his proposal for purposes other than evaluation and has disclosed information that was restrictively marked. Compl. at 9-10; Pl.'s Opp'n at 12-13.

Mr. Scott's allegations of wrongful disclosure and use are speculative. In support of his claims, he points to no corroborating facts other than seeing, "without even looking for them," signs that "the Air Force or somebody else" had taken and implemented part of the approach he had proposed. Compl. at 9. All of his claims of improper disclosure arise from these observations, *i.e.*, he infers that the Air Force or the Central Intelligence Agency ("CIA") must be using his approach because he submitted it in January 2017, he observed changes at the base after that submission, and the changes could not have been implemented but for the contracting

---

[3]Mr. Scott's various ideas might have conceptual worth and eventual utility when further developed, but as FAR § 15.608 provides, the Air Force may use "any . . . concept[] or idea in [his] proposal that is also available from another source without restriction." FAR § 15.608(a) (quoted in full *supra*, at 5).

officer's having disclosed the proposal to someone else at the Air Force or the CIA. *See* Compl. at 9-10; Pl.'s Opp'n at 14-16; *see also* Compl. Ex. 9, at 1 ("[T]here are indications that the contents of my [a]pproach have been shared . . . .").

Mr. Scott asserts that his claims are not speculative because "there are . . . [two] data points" indicating that two aspects of his approach have allegedly been implemented, *viz.*, "the Intel Fusion Center and the off[-]base patrols." Pl.'s Opp'n at 16. The alleged facts supporting his assertion that the changes at the base originated with his proposal are speculative themselves. Other than the "signs" that portions of his approach were being implemented, he offers only the conversation he had with "a Turkish man who works on base [who] told [him] about an unusual change in off-base patrols outside the base perimeter that seemed to reflect a measure . . . that is part of [his] proprietary [a]pproach." *Id.* Mr. Scott fleshed out this conversation in his cease and desist e-mail: He believed that the ground-control and local-engagement prongs of his approach were being implemented by way of CIA involvement in local, Turkish law enforcement outside of the base's perimeter fence and because he "heard . . . that a [U.S.] Army unit of several hundred soldiers [was] coming to Incirlik to augment security." Compl. Ex. 9, at 2. If there is a connection between the CIA being involved with local law enforcement and Army soldiers coming to augment security at the base, Mr. Scott never makes it. Further, assuming the CIA truly engaged with local law enforcement, he offers no explanation how anything short of speculation connects such engagement to his proposal or even a response to the threat of drone strikes at all.

Mr. Scott offers even less in way of support for his claim that his proposed intelligence center is being established. In the same cease and desist e-mail, he states only that "[i]t appears to [him] that an activity . . . has started to stand up a separate Intel Fusion Center[] dedicated specifically to the drone threat that [he] brought to [the Air Force's] attention. It has been created in the last few weeks and is being staffed up." Compl. Ex. 9, at 2. Mr. Scott does not clarify why it "appears" to him that such facility has been created, is specifically carrying out the functions he proposed, or is derived from his ideas and not from other sources. In these latter respects, Lieutenant Colonel William C. Smith, commander of the squadron that provided security for Incirlik Air Base during the time of the event in question, stated in a declaration that he was "not aware of the institution of a 'separate Intel Fusion Center dedicated specifically to the drone threat' . . . during [his] tenure at Incirlik" or any "specific anti-drone force protection procedures and methods described in [Mr. Scott's u]nsolicited [p]roposal." Def.'s Mot. App. 5, at 2. Colonel Smith also declared that the protective measures implemented at Incirlik "originated from sources other than Mr. Scott's . . . [p]roposal and were already implemented before" its receipt. *Id.* at 3-4. Mr. Scott's claims that either the information in the proposal was disclosed or used for purposes other than evaluation are unavailing in the circumstances.

Mr. Scott's allegations are also implausible. To credit his allegations, one must accept something approaching his assumptions that "the first time the Air Force gave any thought to pursuing an overall response to [d]rones is when [it] read [*his*] proposed overall response to [d]rones," Compl. at 9, and that "[t]he Air Force went to school on the emerging [d]rone threat, and on the appropriate counter-measures, when they read [his proposal]." Compl. at 10. Mr. Scott implies that "the [g]overnment's [drone response] needs cannot reasonably be otherwise met" except by Mr. Scott. *See, e.g.*, Pl.'s Opp'n at 7; *cf.* Compl. at 9. Yet he alleges no facts that

indicate that he has any special knowledge or expertise that make it more likely that he, rather than anyone else at the base, would have come up with the only satisfactory overall response to the threat of a drone strike on Incirlik. In fact, his expertise seems to have been developed during one week studying the Incirlik Air Base, "two weeks researching how to defend against [the drone] threat, and another [two] weeks designing an organization to conduct that defense." Compl. at 6. This is not to say that developing such expertise in the elapsed time is impossible, but that is not the standard.[4]

Mr. Scott's claims that the government breached its implied-in-fact contract by using information in his proposal for purposes other than evaluation is both speculative and implausible. Therefore, it shall be dismissed.

## C. Takings Claim

Finally, Mr. Scott claims that the government has effectuated a Fifth Amendment uncompensated taking of his "private [i]ntellectual [p]roperty . . . for public use." Pl.'s Opp'n at 8 (paraphrasing U.S. Const. amend. V (Takings Clause)). The Tucker Act grants this court "jurisdiction to render judgment upon any claim against the United States founded . . . upon the Constitution." 28 U.S.C. § 1491(a)(1).

Even assuming that Mr. Scott has a property interest in his conceptual plan, a matter in dispute, he has failed to state a takings claim for which relief can be granted. A takings claim must be premised on otherwise lawful government action. *Acadia Technology, Inc. v. United States*, 458 F.3d 1327, 1330-31 (Fed. Cir. 2006) (citing *Rith Energy, Inc. v. United States*, 247 F.3d 1355 (Fed. Cir. 2001) ("[A]n uncompensated taking and an unlawful government action constitute two separate wrongs that give rise to two separate causes of action.") (citation and internal quotation marks omitted)). Mr. Scott does not allege that the government took his property through valid governmental action, *see id.*, but rather that it engaged in misappropriation and theft. *See* Compl. at 9-12 ([T]his is . . . misappropriation (theft) of my intellectual property."); Pl.'s Opp'n at 8 ("That's one of the downsides of stealing; you don't get to go back and negotiate terms."). Because there is no basis for Mr. Scott's takings claim in law, it shall be dismissed.

---

[4]Mr. Scott endeavors to shore up his improper-disclosure claim by submitting his motion to clarify and amend his complaint. In that motion, plaintiff cites an article published in the *New York Times* on September 23, 2017, entitled "Pentagon Tests Lasers and Nets to Combat a Vexing Foe: ISIS Drones." Pl.'s Mot. to Amend at 1. Mr. Scott avers that this program was instituted by the Department of Defense after he submitted his unsolicited proposal and owes much to his ideas and concepts. *Id.* at 2. Defendant counters that the article "does not reference Incirlik AB[,] . . . does not reference the date of the program launch in February 2017 or any other time[,] . . . and does not even reference the Air Force." Def.'s Resp. to Pl.'s Additional Specification at 2, ECF No. 21. Defendant argues that "[t]he only similarity between what Mr. Scott proposes and what the article addresses is that both are conceptual." *Id.* This critical commentary by defendant is valid, and plaintiff's motion in effect adds no pertinent material facts in support of plaintiff's improper-disclosure claim.

## CONCLUSION

For the reasons stated, the government's motion to dismiss Mr. Scott's complaint is GRANTED.  The clerk shall enter judgment in accord with this disposition.[5]

No costs.

It is so **ORDERED**.

_____
Charles F. Lettow
Judge

---

[5]For the reasons stated *supra*, at 10 n. 4, plaintiff's motion to amend is DENIED.